# EXHIBIT B

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON  2/22/2021
By  /s/ Anthony Berini
Deputy Clerk

**POMERANTZ LLP**
Jordan L. Lurie, State Bar No. 130013
jllurie@pomlaw.com
Ari Y. Basser, State Bar No. 272618
abasser@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: (310) 432-8492

*Attorneys for Plaintiff*

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN MATEO

| | |
|---|---|
| SHARI ROSENMAN, individually and on behalf of all others similarly situated, | Case No.  21-CIV-00896 |
| Plaintiff, | <u>**CLASS ACTION COMPLAINT**</u> |
| vs. | **1. VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200, *et seq.*; and**. |
| FACEBOOK, INC., a Delaware corporation headquartered in California, | **2. UNJUST ENRICHMENT** |
| Defendant. | |

Plaintiff Shari Rosenman ("Plaintiff"), individually and on behalf of all other California citizens similarly situated, brings this action against Defendant Facebook, Inc. ("Facebook"), upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record, and alleges as follows:[1]

## INTRODUCTION

1.     As Facebook has grown through a series of major acquisitions of budding rivals like Instagram and WhatsApp, Facebook has inflicted a specific harm on consumers, namely, it has forced them to accept ever worse privacy settings. Consumers suffer because Facebook locks in users claiming to protect their data and privacy, only to break those promises with impunity.  This action seeks to remedy Facebook's wrongful conduct.

## JURISDICTION AND VENUE

2.     This class action is brought pursuant to California Code of Civil Procedure section 382. The monetary penalties and restitution sought by Plaintiff exceed the minimal jurisdictional limits of the Superior Court and will be established according to proof at trial. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, section 10. The statutes under which this action is brought do not specify any other basis for jurisdiction.  Plaintiff's share of civil penalties sought in this action does not exceed $75,000.

3.     This Court has jurisdiction over Facebook because Facebook is a citizen of the State of California, with its national headquarters at 1601 Willow Road, Menlo Park, California, and because Facebook has sufficient minimum contacts in the State of California.  Furthermore, Facebook has intentionally availed itself of the California market so as to render the exercise of jurisdiction over Facebook by the California courts consistent with traditional notions of fair play and substantial justice.

4.     Venue is proper in this Court because Facebook conducts business within the State of California, a substantial portion of the transactions and occurrences that form the basis of Plaintiff's action occurred in this County, and Facebook's Terms of Service[2] require that any

[1] All emphasis in text is added unless otherwise noted.
[2] Facebook's Terms of Service, https://www.facebook.com/terms.php, last accessed February 22, 2021.

claim, cause of action, or dispute against Facebook that arises out of or relates to its products or services be resolved exclusively in San Mateo County.

**PARTIES**

5.     Plaintiff Shari Rosenman ("Plaintiff") is, and at all times relevant hereto has been, a resident and citizen of the State of California.

6.     Plaintiff maintains an active Facebook account and uses Facebook. Plaintiff also uses WhatsApp.

7.     Plaintiff cares about her online privacy and trusted Facebook to protect her privacy. But since the Cambridge Analytica scandal broke in 2018 and exposed Facebook's lack of privacy protections and low-quality data privacy practices, she does not trust Facebook to protect her online privacy. Plaintiff dislikes the invasiveness of Facebook and its products. Despite this, Plaintiff continues and plans to continue to use Facebook and Whats App products because people she knows use them, and there are no other suitable alternatives to connect with her friends and family.

8.     If Plaintiff had known the truth about Facebook's privacy practices years ago, she would not have agreed to give Facebook access to as much personal data about herself.

9.     Facebook is a Delaware corporation with its principal place of business located within this District at 1 Hacker Way, Menlo Park, California 94025. Facebook's common stock trades on the New York Stock Exchange under the ticker symbol "FB." Facebook's market capitalization as of June 10, 2020, was approximately $680 billion.

10.     Facebook owns and operates several business divisions, such as:

- <u>Facebook</u>: Facebook's core social media application, which bears the company's name, is, according to Facebook's filings with shareholders, designed to enable "people to connect, share, discover, and communicate with each other on mobile devices and personal computers." The Facebook core product contains a "News Feed" that displays an algorithmically ranked series of content and advertisements individualized for each person.

- **Instagram**: Instagram is a social media photo-sharing application that allows users to share photos, videos, and messages on mobile devices. Facebook acquired Instagram in April 2012.

- **Messenger**: Facebook's Messenger application is a multimedia messaging application, allowing messages that include photos and videos to be sent from person to person across platforms and devices.

- **WhatsApp**: WhatsApp is a secure messaging application used by individuals and businesses. Facebook acquired WhatsApp in 2014.

11. The true names and capacities of Defendants sued in this Complaint as Does 1 through 10, inclusive, are currently unknown to Plaintiff, and therefore Plaintiff sues such Defendants by such fictitious names. Plaintiff is informed and believes, and thereon alleges, that DOES 1 through 10 were the partners, agents, owners, shareholders, managers, or employees of Facebook at all relevant times.

12. Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants was in some manner legally responsible for the actionable and unlawful actions, policies and practices as alleged herein. Plaintiff will amend this Complaint to set forth the true names and capacities of said Defendants, along with the appropriate charging allegations, when the same have been ascertained. Reference in this Complaint to "Facebook" or "Defendant" is also a reference to all Defendants sued as Does 1 through 10.

13. Plaintiff reserves the right to expand, limit, modify, or amend these allegations at any time, based upon, inter alia, changing circumstances and/or new facts obtained during discovery.

## SUBSTANTIVE ALLEGATIONS

### Facebook's Popularity

14. Facebook is by far the biggest social network in the United States. Facebook itself boasted in 2011 that "Facebook is now 95% of all social media."

15. Facebook is the reigning platform, not only in the lives of Americans, but in the lives of 2.2 billion people worldwide. Facebook is the world's largest social media company,

and it provides users with an online platform to stay connected with family and friends through the sharing of photos, videos, and other content.

16. When considering Facebook users by state, California is the leader with approximately 2.5 million users.[3]

17. Consumers effectively face a singular choice: either to use Facebook and submit to the quality and stipulations of Facebook's product or forgo all use of the only social network used by most of their friends, family, and acquaintances. Ninety-Nine percent of adults in the U.S. that use social media use Facebook.

18. The reason for this is that Facebook is a "closed" communications network and users must join simply to access the network. Not all social networks are closed— LinkedIn, for example, disseminates user communications across its own network and also Twitter. But, Facebook, with the greatest number of users, declines the path of interconnection, or inter-operability. Even if one does include other social networks as part of a relevant market, Facebook still dominates with over 80% of total consumer time spent across various social networks.

19. Facebook's popularity gives it wide latitude to set the terms for how its users' private information is collected, used, and protected and the privacy protections afforded to its users. Content shared by users is displayed to other users. Facebook controls how users engage with their closest connections and what content users see when they do. Because Facebook users have nowhere else to go for this important service, the company is able to make decisions about how and whether to display content on the platform and can use the personal information it collects from users solely to further its business interests, even where those choices conflict with the interests and privacy considerations of Facebook users.

**Facebook Reneged on Its Privacy Commitments to Consumers**

20. Facebook began its existence in 2004 by differentiating itself on privacy. Unlike then-dominant MySpace, for example, where profiles were visible to anyone by

---

[3] Facebook Statistics, https://99firms.com/blog/facebook-statistics/#gref, last accessed February 22, 2021.

default, Facebook profiles could be seen only by your friends or people at the same school, verified by an .edu email address. Facebook made important representations regarding what it would and would not do. One important representation was the promise to not usurp privacy by using tracking technology: "We do not and will not use cookies to collect private information from any user," vowed an early privacy policy. As Facebook grew in popularity, it began offering users worse and worse privacy experience. Facebook leveraged its popularity to successfully degrade privacy to levels unsustainable in the earlier market when Facebook and its competition were subject to consumer privacy demands. Facebook rapidly unraveled its promise not to conduct commercial surveillance by using the technical framework it built over the years by perpetuating the belief that it would not leverage such a framework for a commercial purpose.

21.     As the company grew, Facebook tried to backslide on its privacy commitments, but it faced discipline from competitors that it still had not cornered. With the threat of losing its customers to competitors, Facebook was forced to reverse course.  For example, in 2007, it rolled out Beacon, a product that allowed it to track user activity even when they were off the site. Facing fierce backlash—Beacon publicly reported consumers' purchase habits on friends' NewsFeeds—the company discontinued Beacon within the year. Zuckerberg called it a "mistake."

22.     For many years, Facebook perpetuated the belief it would not leverage backdoor access, the way it had with Beacon, to conduct surveillance for commercial purposes. Consumers had shown an aversion to the idea of Facebook tracking them while not on Facebook. The steady stream of public claims that Facebook did not and would not use the network of code for social plugins to monitor and track consumer behavior prompted consumers to continue to trust and, therefore, choose Facebook over alternatives in the market.

23.     After rivals like MySpace exited the stage, however, Facebook had less to fear. Today, its "pixel" tracks users all around the internet, just as Beacon did (but without the ill-

considered NewsFeed posts). This is just one of many ways in which Facebook rolled back privacy protections once it sensed that users couldn't take their business elsewhere.

24. Facebook spent the next fifteen years deceiving consumers about the lackluster data privacy protections that it provided to users in exchange for their data. When the scope of commercial surveillance, and the harvesting and use of user data that Facebook's data-brokering practices enabled was first revealed in 2018 following news coverage about the Cambridge Analytica scandal, Facebook had already achieved dominance in the United States.

25. Beginning in 2007, Facebook gave app developers access to user content and information, encouraging them to build apps to stimulate user engagement. Facebook paid these app developers not with cash, but with user content and data, including content marked private. As Facebook attempted to become the world's dominant social media service, it struck agreements allowing phone and other device makers access to vast amounts of its users' personal information.

26. Facebook did not disclose to its users the scope of the content and data that Facebook began providing to third parties at that early date, including user data marked "private."

27. In short, Facebook promised superior consumer privacy protections. Subsequently, Facebook tried to undermine privacy to initiate consumer surveillance for the purpose of delivering more targeted advertising, but the market would not allow it. Only after other social networks like MySpace exited the market, and Facebook amassed over a billion users, was Facebook able to reverse course, and initiate consumer surveillance.

28. With nearly every privacy policy update, Facebook steadily increased the richness of the user data it allowed itself to collect and retain and expanded what it could do with the data. For example, by 2011, Facebook's privacy policy allowed enhanced third-party tracking, permitting Facebook to collect data when users visited a site with Facebook features (such as social plugins); enhanced Facebook's ability to share user data with third parties' sites to enable its "Instant Personalization" product (turned on by default); and allowed Facebook to combine user data from different sources for purposes of deals, events, and ads.

29.     By 2012, Facebook had abandoned a previous pledge to anonymize user data received by Facebook's advertising partners and customers within 180 days, changing the practice to "stor[ing] data for as long as it is necessary to provide products and services to you and others."

30.     By 2015, Facebook had abandoned its previous promise to collect payment account numbers only with user consent and allowed itself to collect "credit or debit card number and other card information, and other account and authentication information, as well as billing, shipping and contact details" if someone used Facebook's services for financial transactions. Facebook also vastly expanded its access to device information—operating system, hardware version, device settings, file and software names and types, battery and signal strength, device identifiers, specific device locations (such as through GPS, Bluetooth, or Wi-Fi signals), connection information such as the name of the user's mobile operator or ISP, browser type, language and time zone, mobile phone number and IP address—and allowed itself to "associate the information we collect from your different devices."

31.     By 2018, Facebook added device operations ("information about operations and behaviors performed on the device, such as whether a window is foregrounded or backgrounded, or mouse movements") to the list of device information it could collect; allowed itself to use facial recognition technology to identify users in photos, videos, and camera experiences; and added content creators to the list of third-party partners who could receive users' data.

32.     As another example of the promises that Facebook made—but subsequently did not keep as Facebook grew—regarding its privacy protections, Facebook announced in 2012 that future privacy changes would require user approval through voting. But consistent with its pattern of deception, Facebook rescinded users' veto power. Facebook revoked its users' ability to vote on changes to its privacy policies and then (almost simultaneously with Google's exit from the social media market) changed its privacy pact with users.  In 2014, Facebook formally announced that it would track users via the login and Like buttons embedded in millions of news sites, online retailers and games.

33. Despite public statements to the contrary, Facebook used the Like button code now installed on third-party sites to write and read user cookies. Each time a Facebook user visited a site with a Like button, Facebook retrieved the user's Facebook website login cookies, which contained the user's unique identifying number, traceable to his or her real identity. Facebook again was leveraging login cookies from the communications network to conduct detailed surveillance possibly for the advertising side of its business. In addition to a user's ID number, Facebook retrieved the specific URL the user was on, which revealed the title of an article the user was reading or the name of the product a user was buying.

34. A revealing insight comes from the summer of 2011, when the company was gearing up to fend off the threat of Google's rival platform, Google+. The States' Attorneys' General recent complaint quotes an email in which Facebook COO Sheryl Sandberg wrote, "For the first time, we have real competition and consumers have real choice … we will have to be better to win." At the time, Facebook had been planning to remove users' ability to untag themselves in photos. One unnamed executive suggested pumping the brakes. "If ever there was a time to AVOID controversy, it would be when the world is comparing our offerings to G+," they wrote. Better, they suggested, to save such changes "until the direct competitive comparisons begin to die down." This is close to a smoking gun: evidence that Facebook preserves user privacy when it fears competition and degrades privacy when it does not.

35. Facebook over time became more aggressive about both collecting data on its users' off-platform activity and pushing users to make more information public. Facebook repeatedly made great efforts to present its privacy changes as giving users greater control, even as Facebook made more privacy settings public and thus less protective by default, took away options to limit visibility, and changed its privacy policy to allow for more collection and use of user data.

36. Indeed, even if a user chooses to leave Facebook, the company still subjects the user to surveillance, but the user no longer has access to the privacy settings. Staying on the platform is the only way to try to manage its harms.

37.     As Facebook grew in popularity, Facebook backslid on privacy commitments. That conduct was not coincidental. Facebook used its popularity to degrade the quality of service.  Consumers suffer at the hands of companies like Facebook because Facebook locks in users with promises to protect their data and privacy, only to break those promises once it has gained popularity in the marketplace.

38.     Facebook is "free" to use.  However, users exchange their time, attention, and personal data for access to Facebook's services. Instead of charging users a fee to use its service, Facebook sells advertising to marketers. In the digital advertising market, the ability to conduct unprecedented commercial surveillance is a bedrock of Facebook's current source of revenues and profits. Facebook generates nearly all of its revenues from the sale of advertising, and the prices of ads sold today directly correlate with data derived from tracking consumers.

39.     Rather than raising prices, Facebook harmed consumers by charging them the use of ever-increasing amounts of their personal data to use its platform.  Consumer harm can exist through the use of personal data, even if the service is free.

40.     Facebook's conduct has caused consumers to suffer and to continue to suffer substantial economic injury through the degradation of their privacy. Consumers give up something of material value when agreeing to Facebook's Terms of Service: personal information and privacy. That information and attention is then sold in measurable units to advertisers in exchange for substantial amounts of money. Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service.

41.     Facebook's conduct also deprives users of product improvements and, as a result, users have suffered, and continue to suffer, reductions in the quality and variety of privacy options and content available to them.

42.     Facebook's conduct alleged herein has inflicted harm and injury.  Specifically, Facebook has forced consumers to accept ever worse privacy settings and degraded privacy protections.  Facebook rolled back privacy protections once it sensed that users could not or would not take their business elsewhere.

1     43.     Facebook may not charge users a fee, but that does not mean that users haven't

2     been paying a price.

3     44.     By this action, Plaintiff seeks recovery for consumers' losses and Facebook's

4     unlawful gains, and other appropriate equitable relief to prevent Facebook from continuing to

5     harm consumers.

6              **Plaintiff Does Not Allege a Federal Claim or Federal Law Violation**

7     45.     Plaintiff's California state law claims do not allege a violation of any antitrust

8     law or reference a violation of federal antitrust laws.  Plaintiff's claims are not federal in

9     character. Federal law is not an element of Plaintiff's claims and does not create Plaintiff's

10    cause of action, and Plaintiff's claims do not rest on the allegation that Facebook violated any

11    federal law. Plaintiff's right to relief does not depend on resolution of any disputed federal

12    question, and federal law is not essential to her claim.

13    46.     The gravamen of Plaintiff's case does not require any finding that Facebook

14    violated any federal law, and Plaintiff will not have to establish that Facebook violated any

15    federal law in order to prevail on her claims.  Plaintiff's claim also does not depend on a

16    finding that Facebook is a "monopoly" or engaged in "monopolistic conduct."  Facebook's

17    conduct is unlawful and violates the UCL regardless of whether it represents a violation of

18    antitrust law. Plaintiff's UCL claim is a standard consumer claim that challenges Facebooks'

19    privacy policies.  Facebook forced consumers to accept ever worse privacy settings and

20    degraded privacy protections, which was unfair, unlawful, or fraudulent under the UCL, and

21    Facebook has been unjustly enriched by that conduct.  The issues raised by this action are

22    purely state law issues.

23              **PLAINTIFF'S CLASS ACTION ALLEGATIONS**

24    47.     Plaintiff re-alleges and incorporates by reference each allegation set forth above.

25    48.     Plaintiff brings this action on her own behalf, as well as on behalf all other

26    California citizens similarly situated, and thus seeks class certification under California Code of

27    Civil Procedure section 382.

28

49.     All claims alleged herein arise only under California law for which Plaintiff only seeks relief authorized by California law. Plaintiff does not seek relief under any federal law.

50.     Plaintiff's proposed California Class consists of and is defined as follows:

> All California citizens who, while citizens of the State of California, maintained a Facebook profile at any time within four years of the date of the filing of this action (the "Class" or "California Class").

> Excluded from the California Class are non-California citizens and citizens of States other than California; persons who are not United States citizens; businesses with locations in California, but who are incorporated and have their principal place of business outside of California; Facebook; any entity in which Facebook has an interest, and any of Facebook's: corporate parent, affiliate(s), subsidiary(ies), officers, directors, legal representatives, successors, and assigns. Also excluded from the California Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

51.     Members of the California Class are referred to herein as "Class members" or "California citizens." It is Plaintiff's express intention to limit the putative class to California citizens.

52.     More than two-thirds of prospective class members (indeed, all class members) are citizens of the State of California, where this action is filed. Facebook also is a citizen of the State of California where this action is filed, even if it is also a citizen of Delaware. The fact that Facebook has dual citizenship in Delaware does not mean that it has alternative citizenship and is not a citizen of California.

53.     Plaintiff reserves the right to redefine the California Class and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

54.     There are common questions of law and fact as to Class members that predominate over questions affecting only individual members, including, but not limited to:

(a)     Whether Facebook's deception of consumers about its data privacy practices violated the California Business and Professions Code section 17200, *et seq*. (the "UCL");

(b)     Whether Facebook's conduct violated the UCL;

| | |
|---|---|
| 1 | (c) Whether Facebook was unjustly enriched by its deception of consumers about its |
| 2 | data privacy practices; |
| 3 | (d) Whether Facebook intentionally made material misrepresentations or omissions |
| 4 | about its data privacy practices and the extent of its commercial surveillance; |
| 5 | (e) Whether Facebook's conduct should be enjoined or whether other equitable relief |
| 6 | is appropriate; and, |
| 7 | (f) The appropriate amount of restitution or monetary penalties resulting from |
| 8 | Facebook's violations of California law. |
| 9 | 55. There is a well-defined community of interest in the litigation and the California |
| 10 | Class members are readily ascertainable: |
| 11 | (a) Numerosity: The California Class members are so numerous that joinder of all |
| 12 | Class members would be unfeasible and impractical. The membership of the |
| 13 | entire Class is unknown to Plaintiff at this time; however, the California Class is |
| 14 | estimated to be greater than one hundred (100) California citizens and the |
| 15 | identity of such membership is readily ascertainable by inspection of Defendant's |
| 16 | records. |
| 17 | (b) Typicality: Plaintiff is qualified to, and will, fairly and adequately protect the |
| 18 | interests of each Class member with whom she has a well-defined community of |
| 19 | interest, and Plaintiff's claims (or defenses, if any) are typical of all Class |
| 20 | members as demonstrated herein. |
| 21 | (c) Adequacy: Plaintiff is qualified to, and will, fairly and adequately protect the |
| 22 | interests of each Class member with whom he has a well-defined community of |
| 23 | interest and typicality of claims, as demonstrated herein. Plaintiff acknowledges |
| 24 | that she has an obligation to make known to the Court any relationship, conflicts |
| 25 | or differences with any Class member. Plaintiff's attorneys, the proposed Class |
| 26 | counsel, are versed in the rules governing class action discovery, certification, |
| 27 | and settlement. Plaintiff has incurred, and throughout the duration of this action, |
| 28 | will continue to incur costs and attorneys' fees that have been, are, and will be |

1  necessarily expended for the prosecution of this action for the substantial benefit

2     of each Class member.

3     (d)    Superiority:  The nature of this action makes the use of class action adjudication

4           superior to other methods.  A class action will achieve economies of time, effort,

5           and expense as compared with separate lawsuits, and will avoid inconsistent

6           outcomes because the same issues can be adjudicated in the same manner and at

7           the same time for the entire class.

8                    **EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS**

9     56.    The existence of the anticompetitive acts alleged herein could not be discovered

10 until, at the earliest, March 17, 2018. As the House Antitrust Subcommittee recently explained,

11 "[t]o the extent that consumers are aware of data collection practices, it is often in the wake of

12 scandals involving large-scale data breaches or privacy incidents such as Cambridge

13 Analytica."[4] It was not until the media uncovered the details of the Cambridge Analytica

14 scandal on March 17, 2018, that consumers began to discover Facebook's practices that harmed

15 consumers and that would have enabled consumers to raise the claims presented in this action.

16 Similarly, it was not until the media revealed the details of Apple's ban of Onavo on August 22,

17 2018, that consumers learned of the additional facts regarding Facebook's conduct necessary for

18 consumers to raise the claims presented in the action.

19    57.    Nor could Plaintiff have discovered, through the exercise of reasonable diligence,

20 the existence of the unfair, deceptive and unjust acts alleged herein until, at the earliest, March

21 2018. The subsequent investigative reporting that brought to light Facebook's systematic

22 deception and commercial surveillance was not made public until, at the earliest, March 17,

23 2018, following the Cambridge Analytica scandal. Consequently, Plaintiff and Class members

24 did not discover, nor could they have discovered through reasonable diligence, that Facebook

25 was violating California law until less than four years before this litigation was initially

26

27 [4] See Investigation of Competition in Digital Markets, Majority Staff Report and
   Recommendations ("House Report"), Subcommittee on Antitrust, Commercial, and
28 Administrative Law of the Committee on the Judiciary, at 54, October 6, 2020, available at
   https://kl.link/3jGISfK.

commenced. Accordingly, the statute of limitations should be equitably tolled to March 2018. As such, all of the unfair, deceptive and unjust conduct described in this complaint presents timely claims.

58. In addition, Facebook's conduct was, by its very nature, inherently self-concealing because it was performed outside the sight and knowledge of consumers. As a result, Plaintiff and Class members did not discover Facebook's scheme, even with the exercise of reasonable diligence.

59. Furthermore, the harm to Plaintiff and Class members was not sufficiently ascertainable to give rise to the claims presented herein more than four years prior to the filing of this action. Since the harm that Plaintiff and Class members allege had not become known more than four years prior to the date that this action was initiated, the unfair competition claims presented herein are timely.

60. Any applicable statute of limitation is tolled by Facebook's knowledge, active concealment, and wrongful conduct set forth herein. Facebook is further estopped from relying on any statute of limitation because of its concealment set forth herein.

## FIRST CAUSE OF ACTION

### Violation of California Unfair Competition Law

### (Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

61. Plaintiff re-alleges and incorporates by reference each allegation set forth above.

62. California Business and Professions Code section 17200, *et seq.* (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Facebook has committed acts of unfair competition proscribed by the UCL, including the acts and practices alleged herein.

63. The UCL imposes strict liability. Plaintiff need not prove that Facebook intentionally or negligently engaged in unlawful or unfair business practices – only that such practices occurred.

64. Facebook is a "person" as defined by Business & Professions Code § 17201.

65.     As a direct and proximate result of Facebook's acts and practices in violation of the UCL, Plaintiff and members of the California Class have suffered injury in fact and lost money or property as set forth above and will continue to do so.

**Unfair Prong**

66.     An act or act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition and is not an injury the consumers themselves could reasonably have avoided.  An act or practice also is unfair if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.  An act or practice also is unfair if Plaintiff's claims are "tethered" to specific constitutional, statutory or regulatory provisions.   Facebook's conduct violates all of these definitions.

67.     As alleged above, Facebook engages and has engaged in a systematic business practice of successfully degrading its users' privacy to levels unsustainable when other competitors were subject to consumer privacy demands.

68.     Facebook's conduct as alleged herein has caused consumers to suffer and to continue to suffer substantial economic injury through the degradation of their privacy. Consumers give up something of material value when agreeing to Facebook's Terms of Service: personal information and privacy. That information and attention is then sold by Facebook in measurable units to advertisers in exchange for substantial amounts of money. Consumers thus give up valuable consideration in using Facebook pursuant to Facebook's Terms of Service. Plaintiff's unfair claim is based on state law theories and is independent of any federal statutory basis.  It does not depend on any violation of antitrust law or require establishing a violation of federal antitrust law.

69.     Facebook's conduct also deprives users of product improvements and, as a result, users have suffered, and continue to suffer, reductions in the quality and variety of privacy options and content available to them.

70. Facebook's conduct alleged herein has inflicted harm and injury. Specifically, Facebook has forced consumers to accept ever worse privacy settings and degraded privacy protections.

71. Rather than raising prices, Facebook harmed consumers by charging them the use of ever-increasing amounts of their personal data to use its platform. Consumer harm can exist through the use of personal data, even if the service is free.

72. All of the acts and practices of Facebook as described in this complaint constitute "unfair" business acts and practices. A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims. Plaintiff and California citizens have suffered injury in fact and a loss of money or property as a result of Facebook's unfair business acts and practices as set forth herein in detail. It is Plaintiff's information and belief that California Class members have also suffered injury as a result of Facebook's wrongful conduct.

73. As a direct and proximate result of Facebook's acts and practices in violation of the UCL, Plaintiff and members of the California Class have suffered and continue to suffer substantial economic injury through the degradation of their privacy. Forcing consumers to accept ever worse privacy settings and degraded privacy protections is clearly unfair.

74. Facebook's conduct does not benefit consumers or competition. Plaintiff and California Class members could not reasonably have avoided the injury each of them suffered or will suffer, which injury is substantial. Facebook's conduct only benefits Facebook, by enabling Facebook to diminish quality and privacy protections for consumers. Plaintiff continues and intends to continue to use Facebook and will continue to suffer injury to her privacy if Facebook's conduct as alleged herein is not enjoined.

75. The gravity of the consequences of Facebook's conduct as described above outweighs the justification, motive or reason therefor, is immoral, unethical and unscrupulous, and offends established public policy that is tethered to legislatively declared privacy policies , or is substantially injurious to the public, for the reasons set forth above.

76.     Facebook's conduct also offends established public policy, or is substantially injurious to the public, for the reasons set forth above.

77.     To the extent that any definition of "unfair" requires a balancing test or weighing various factors, such an inquiry is fact intensive and requires a full factual record as to Facebook's justification and motives for its conduct, and as to the impact of Facebook's conduct on Plaintiff and Class members.

78.     Facebook's acts of unfair competition as set forth above present a continuing threat and will persist and continue to do so unless and until this Court issues appropriate injunctive relief. Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, C.C.P. § 1021.5.

**Deceptive Prong**

79.     Facebook mislead consumers about its data privacy practices and the scope of the data it collected and made available to third parties.

80.     Said conduct is likely to deceive an ordinary consumer because Facebook concealed its privacy practices from consumers.

81.     Plaintiff and California Class members justifiably relied on the information that Facebook disseminated or omitted to disclose about its privacy protections.

82.     The facts concealed and not disclosed by Facebook and concealed from Plaintiff and California citizens are material. Had Plaintiff and members of the California Class known the truth about Facebook's privacy practices years ago, they would not have agreed to give Facebook access to as much personal data about themselves.

83.     Facebook continues to conceal the truth about is privacy protections in order to minimize the amount of money that Facebook makes on ad revenue.

**SECOND CAUSE OF ACTION**

**Unjust Enrichment**

84.     Plaintiff re-alleges and incorporates by reference each allegation set forth above.

85.     Plaintiff and California Class members conferred direct benefits on Facebook in the forms of their personal data, time, and attention.

86.     These benefits are quantifiable in measurable units. Facebook sells access to its users' data, time, and attention to third parties—including advertisers and app developers—for discrete money amounts. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users.

87.     Those benefits received by Facebook were at the expense of Plaintiff and Class members.

88.     Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members. For example, after Facebook's involvement in the Cambridge Analytica scandal came to light in March 2018, Facebook founder Mark Zuckerberg explicitly recognized that Plaintiff and Class members conferred on Facebook the benefit of their data, stating: "We have a responsibility to protect your data, and if we can't then we don't deserve to serve you." Facebook has similarly recognized that Plaintiff and Class members have conferred on it the benefits of their time and attention, as evident from the fact that Facebook internally tracks the time its users spend on Facebook (and its family of products) and compares these figures to the time they spend on other competing services.

89.     Facebook acquired these benefits from Plaintiff and Class members through unlawful conduct. Facebook induced Plaintiff and Class members to join Facebook based on the promise of stringent privacy protections. Meanwhile, Facebook concealed the scope of the data it harvested from Plaintiff and Class members and brokered to third parties

90.     As a result of Facebook's receipt of the direct benefits of Plaintiff's and Class members' data, time, and attention, Facebook was able to enrich itself at the expense of Plaintiff and Class members

91.     Facebook has unjustly reaped significant financial gain as a result of the misconduct alleged herein. In 2019, for example, Facebook collected $70.7 billion in revenue, almost entirely from allowing companies to serve ads to its users. The circumstances alleged herein are such that it would be unjust for Defendant to retain the portion (if not the entirety) of Plaintiff's and Class members' payments, or the value of other consideration, that should have been earmarked to provide higher quality social networking services, and adequate privacy

protections for Plaintiff's and the California Class' private information, including only

surveillance and third-party sharing as authorized by its customers.

92. Plaintiff seeks an order directing Facebook to disgorge these benefits and profits

and pay restitution to Plaintiff and other Class members.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, seeks the

following relief:

a) For an order certifying this case as a class action, appointing Plaintiff as the

representative of the California Class, and appointing counsel for Plaintiff as Class Counsel;

b) That the Court declare, adjudge and decree that that Facebook is financially

responsible for notifying all Class members about the wrongful conduct set forth herein;

c) That the Court declare, adjudge and decree that that Facebook's conduct as

alleged herein violates the laws alleged herein;

d) Injunctive and other equitable relief as is necessary to protect the interests of

Plaintiff and Class members, including: (i) an order prohibiting Facebook from continuing to

engage in the wrongful acts described herein; (ii) requiring Facebook to engage third-party

auditors to conduct audits and evaluations of Facebook's data privacy practices and commercial

surveillance, and ordering Facebook to promptly correct any problems or issues detected by

these auditors, and, (iii) modifying certain business practices, including how Facebook tracks

users when they are off the company's platforms;

e) For an award to Plaintiff and Class members of restitution and/or disgorgement

of all amounts wrongfully charged to and received from Plaintiff and Class members;

f) For the appointment of a receiver as necessary to receive, manage and distribute

any and all funds disgorged from Facebook and determined to have been wrongfully acquired

by Facebook as a result of violations of California Business & Professions Code section 17200,

*et seq.*;

g) For an award of statutory damages including reasonable attorneys' fees and costs

of suit pursuant to California Code of Civil Procedure § 1021.5, and any other applicable law;

h)     For statutory damages including reasonable attorneys' fees, costs of suit and treble damages if Facebook's conduct was done knowingly;

i)     For an award of pre-judgment and post-judgment interest at the legal rate;

j)     For leave to amend this Complaint to conform to the evidence produced at trial; and,

k)     For all other relief as may be appropriate under the circumstances.


Dated: February 22, 2021                    Respectfully submitted,

                                            **POMERANTZ LLP**


                                      By: _____
                                            Jordan L. Lurie
                                            Ari Y. Basser

                                            *Attorneys for Plaintiff*